UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEREK YOUNG,

      Plaintiff,

                                 Case No. 1:23-cv-10

v.

                                 Hon. Paul L. Maloney

CITY OF BATTLE CREEK, *et al.*,

      Defendants.

_____/

## OPINION

In 2021, on a summer night in Battle Creek, Michigan, Plaintiff Derek Young had recently left work and was standing and talking to his brother Michael Stein and Anthony Robinson outside Robinson's apartment complex. About fifteen minutes after Young got there, Young ended up handcuffed, in the back of a Battle Creek police cruiser, having been forcibly taken to the ground for resisting an unlawful stop and frisk. Young was later charged with resisting arrest and obstructing justice. Young brought this suit against the City of Battle Creek, Officer Garrett Day of the Battle Creek Police Department, and Officer Robert Henley of the Battle Creek Police Department (the "Officers"), alleging that the Officers unlawfully arrested him for resisting arrest and obstructing justice. (ECF No. 1.) Young also asserts claims alleging violations of his Fourth Amendment rights, accusing the Officers of using excessive force and conducting an unlawful stop and frisk. In addition, Young brought a *Monell* claim against the City of Battle Creek, however, the Court dismissed that claim in its June 14, 2023, order. (ECF No. 17.) Now before the Court is the Officers' Motion for Summary Judgment on Young's remaining claims. (ECF No. 44.) For the following reasons, the Court denies their motion.

# I. BACKGROUND

## A. Factual Background

At the time of the incident, Young was around thirty-seven years old and a resident of Battle Creek, Michigan. (*See* Booking Report, ECF No. 49-10, PageID.670; Young Dep. 11, ECF No. 49-2.) He was approximately five feet and eleven inches tall and weighed around one hundred and sixty-five pounds. (Booking Report, PageID.670.) Young, who is black, worked at Denso Manufacturing Michigan ("Denso") in Battle Creek, where he worked the second shift. (*See* Young Dep. 14-16, 30-31.)

The Officers worked for the Battle Creek Police Department. (Day Dep. 9, ECF No. 49-3; Henley Dep. 28, ECF No. 49-9.) Officer Day was around five feet and ten inches tall and weighed approximately two hundred and ten pounds. (Day Dep. 8.) He had been a police officer for approximately five years before the incident. (*See id.* at 14-15.) Officer Henley was around five feet and seven inches tall and weighed around two hundred and ten pounds. (Henley Dep. 23.) At the time of the incident, Officer Henley was a sergeant and had been a police officer for approximately thirteen years. (*See id.* at 28-29.)

On July 24, 2021, a Saturday, Young was working at Denso, earning some overtime. (Young Dep. 30-31.) After he got off work, his brother, Stein, called and invited him to hang out. (*Id.* at 31-32.) Young told Stein that he would meet up with him later that night. (*Id.* at 32.) After Young got home from work and changed his clothes, he called Stein, asking where he was. (*Id.*) Stein said he was on Howland Street in Battle Creek. (*Id.* at 35, 38.) Stein did not tell Young the exact address; he just said Howland Street. (*See id.* at 28, 32, 34-36.) Young drove to Howland Street, not knowing exactly where his brother was. (*See id.* at 26-28, 33-36.)

Young arrived on Howland Street around 10:10-10:15 p.m. (*See id.* at 123; Police Report, PageID.326.) He saw his brother outside Robinson's apartment complex, but Young did not know

2

Robinson well and did not know that he was at Robinson's apartment complex.  (*Id.* at 25-26, 36-37.)  Stein stood on the concrete walkway leading to the front porch of the apartment complex.  (Young Dep. 36-37.)  Robinson was sitting on the porch.  (*Id.* at 43.)   Young proceeded up to his brother and Robinson, saying what's up.  (*Id.* at 39.)  Robinson remained seated on the porch while Young and Stein stood on the concrete walkway before the porch.  (*See id.* at 40; Day Body Worn Camera 00:51-01:00, ECF No. 49-5.)  They listened to music and talked among themselves.  (Young Dep. 41.)

Before Young arrived and unknown to him when he did arrive, Robinson had unlawfully possessed a firearm.  (Police Report, PageID.326; Young Dep. 122.)  Officer Day, who was working road patrol, was also in the Battle Creek Gang Suppression Unit, and one of his roles was to monitor the activity of gang members in the Washington Heights neighborhood, a high-crime area.  (Day Dep. 18, 21, 26-27.)   One way he monitored gang activity was by viewing posts on social media accounts such as Snapchat.  (*See id.* at 20.)  Snapchat is a social media platform that allows its users to share pictures and videos with others utilizing its "story" feature.  Elise Moreau, *What Is a Snapchat Story?*, LIFEWIRE, (Sept. 13, 2021), https://www.lifewire.com/what-is-a-snapchat-story-3486000.  On July 24, 2021, around 10:05 p.m., Robinson posted a video on his Snapchat story.  (Police Report, PageID.326.)  According to Officer Day, Robinson—a known felon—posted a video of him "sitting in a chair next to a white front door on a front porch.  Robinson . . . was holding a silver/black handgun."  (Police Report, PageID.326; Young Dep. 28.)  The video showed Robinson at his residence at 216-1 Howland Street in Battle Creek, Michigan.  (Police Report, PageID.326.)  Robinson was the only person in the video.  (*See* Young Dep. 26.)  Young was not mentioned in the video.  (*See id.*)

Consequently, Officer Day planned to engage Robinson at his apartment complex.  (Police Report, PageID.326.)  But because it was a Saturday night in Battle Creek, he decided to "clear" his

plan with Officer Henley, his supervising officer.  (Henley Dep. 34-36.)  They met at a park a mile or two away from Robinson's apartment complex to discuss the situation and plan.  (Day Dep. 75.) The plan was to have the Officers and a third unit engage Robinson at his apartment complex. (Henley Dep. 37.)  The third unit, however, did not show.  (*Id.*)

The Officers drove separately to Robinson's apartment complex.  (Day Dep. 27.)  They arrived at 10:30 p.m., around twenty-five minutes after Robinson posted the video and fifteen minutes after Young arrived.  (Dispatch Report, PageID.615; *see* Police Report, PageID.326.) Officer Day parked his police cruiser on Howland Street in front of Robinson's apartment complex. (Day Dep. 32.)  And "as [Officer Day] pulled in front of the residence, [he] saw three males including Robinson."  (Police Report, PageID.326.)  He immediately exited the cruiser once he put it in park. (Day Body Worn Camera 00:42-00:47.)  At this point, Officer Henley was pulling behind Officer Day's cruiser.  (Henley Dep. 39.)

When he exited his cruiser, "it was . . . pretty dark out."  (Day Dep. 35.)  He illuminated the porch area by shining his flashlight.  (*See* Day Body Worn Camera 00:45-01:00.)  Once he shined his flashlight towards the porch, he saw Robinson sitting on the porch and Young and Stein standing on or near the concrete walkway to the porch.  (*See id.*)  Robinson then got up and walked into his apartment complex, making no movement toward Young and Stein.  (*Id.*)  While Robinson walked into the complex, Officer Day shouted: "Anthony stop, get over here."  (*Id.*)  As Officer Day continued to approach the porch, Officer Henley exited his police cruiser and saw "[Officer Day] take off towards the [apartment complex]."  (Police Report, PageID.328; *see* Henley Body Worn Camera 00:26-00:36, ECF No. 49-7; Day Dep. 33.)  In response, Officer Henley ran towards the porch.  (Henley Body Worn Camera 00:26-00:36.)

Officer Day continued to approach, moving towards Stein and Young.  (Day Body Worn Camera 00:51-01:00.)  Young stood parallel to the street from where Officer Day approached.  (*Id.*)

4

Young did not make any sudden movements and did not reach into his pockets, waistband, or hip area.  (*Id.*; Day Dep. 44.)  Young's only movement was when he turned his neck towards Officer Day and asked, "what's going on."  (Day Body Worn Camera 00:51-01:00; Day Dep. 34-37.)  Officer Day, not responding and not identifying himself as police, then grabbed Young to effectuate a pat-down search.  (Day Body Worn Camera 00:50-01:05; Young Dep. 45-46; Henley Dep. 43.)

Once Officer Day grabbed Young, Young asked, "what is you searching me?"  (Day Body Worn Camera 00:59-01:02.)  As he was starting the search, he testified that he "felt something hard." (*Id.* at 00:59-01:05; Day Dep. 43.)  He could not tell what it was but believed it to be a gun.  (Day Dep. 43.)  After he felt what was thought to be a gun, Young purportedly "jerked away from [Officer Day] as soon as [Officer Day] patted it down.  [Young] immediately turned his body away so that [Officer Day] couldn't continue to pat him down."  (*Id.* at 45.)  Young, however, testified that he "kind of just jumped.  It may have looked like I pulled away, but it caught me off guard."  (Young Dep. 117.)

At this point, Officer Henley approached, shining his flashlight on Young and Day.  (Henley Body Worn Camera 00:35-00:52.)   Officer Henley testified that when he approached, he saw something in Young's hand but was unsure what.  (Henley Dep. 47.)  Officer Henley also observed Officer Day attempting to get Young's hands behind his back for about fifteen seconds.  (Henley Body Worn Camera 00:35-00:52.)  During these fifteen seconds, Young was not moving much, if at all, but Officer Day could not keep Young's hands behind his back.  (*Id.*)

Officer Henley testified that Officer Day was struggling because Young was "definitely twisting his body and stiffening up his arms. . . ."  (Henley Dep. 46.)  So he jumped in to assist Officer Day by attempting to handcuff Young by putting one cuff on Young's left wrist.  (Henley Body Worn Camera, 00:50-00:57.)  In putting the handcuff on his left wrist, Officer Henley's body camera shows Young's right hand holding a cell phone.  (*See id.*)  Despite their efforts, they couldn't

get both of Young's hands behind his back.  (*See* Henley Dep. 58-59.)  While trying to get Young's hands behind his back, Young repeated "what is you searching me," "you can't do that," "I know my rules and my rights . . . you can't just come and search me."  (Day Body Worn Camera 00:49-1:13; Henley Body Worn Camera 00:38-00:51.)  The Officers told Young to stop.  (*See id.*)  Young testified, however, that he did not move his body to evade from the Officers: "No. No.  Not get away, no.  Just more like trying to get a clarification of what's going on."  (Young Dep. 117.)

About thirty-five seconds after Officer Day first grabbed Young to frisk him, the Officers coordinated to take Young to the ground to handcuff him.  (Day Body Worn Camera 01:00-01:35; Henley Dep. 58-59.)  They turned Young around so that his body was facing Howland Street and moved him a couple of feet away from the porch toward the street.  (Day Body Worn Camera 01:00-01:37; Henley Body Worn Camera 01:00-01:13.)  Officer Day, who was on Young's right side, told Officer Henley, who was on Young's left side, "we're going to go my way," which was code that Officer Henley should let go and let Officer Day take Young to the ground.  (*Id*; Henley Dep. 58-59.)  To perform the maneuver, Officer Day stuck his foot in front of Young's legs, then pushed him from the back and pushed his right arm down so Young would trip and fall over Officer Day's foot.  (Police Report, PageID.326; Day Dep. 52; Stein Cell Phone Video 00:01-00:05, ECF No. 49-8.)  As a result, Young tripped and fell, falling face-first, landing on his chest and stomach.  (Police Report, PageID.326; Stein Cell Phone Video 00:01-00:05.)

While Young was lying on his stomach, Officer Henley moved to handcuff him.  (*See* Stein Cell Phone Video 00:01-00:20.)  Officer Day was on his knees, hovering over Young's right side and gripping Young's right arm.  (Stein Cell Phone Video 00:01-00:20.)  Officer Henley was on Young's left side.  (*Id.*)  Officer Henley then put his knee into Young's back for leverage to cuff Young's left wrist and then brought it towards Young's right wrist to cuff them together.  (*Id.*)  Apparently, he was still "tense."  (Day Dep. 53.)  The Officers successfully handcuffed Young. (*Id.*)

At no time did either officer tell Young he was under arrest. (Henley Dep. 44; Day Dep. 39; Young Dep. 58.) It was not until Young was placed in the rear of a police cruiser that he was told he was under arrest and that he was going to jail for resisting arrest. (Young Dep. 58.) He was taken to Calhoun County jail. (*Id.*)

Officer Day testified that he initially grabbed Young's arm and tried to put his hands behind his back to search him for weapons. (Day Dep. 39; Henley Dep. 43.) He was concerned that Robinson passed a gun to Young before he entered the apartment complex. (Day Dep. 88-89.) In their experience, it is common for felons to pass guns to non-felons so the felon can evade an unlawful possession charge. (Day Dep. 89; *see* Henley Dep. 90.) Officer Day was also concerned that if he chased after Robinson into the apartment complex, Stein and Young could have followed and ambushed him. (Day Dep. 93-94.) Officer Day testified, however, that he did not see Young's hands as he approached or a bulge. (*Id.* at 35, 44.) Indeed, when the Officers searched Young, they found no contraband. (Henley Dep. 73-74.) Young possessed only a cell phone, portable cell phone charger, cell phone clip, and wallet. (*Id.*; Young Dep. 49.)

## B. Procedural History

The City of Battle Creek charged Young with felony resisting arrest and obstructing justice. (Felony Compl., ECF No. 49-11, PageID.672.) But the charges were eventually dismissed. (Dec. 14, 2021, Preliminary Examination Transcript, ECF No. 49-14, PageID.738.) The state court found that the Officers did not have reasonable suspicion that Young was engaged in criminal activity. (*Id.*) Thus, "any detention of the defendant from that point forward does not have a legal basis. And the instructions that the defendant comply at that point related to a search do not apply as there was no reasonable articulated suspicion. [T]he charges against Mr. Derek Young are dismissed at this time." (*Id.*)

On January 3, 2023, Young filed this lawsuit against the Officers and the City of Battle Creek, alleging violations of his Fourth Amendment rights to be free from wrongful arrest, excessive force, and unlawful search and seizure under 42 U.S.C. § 1983.  (Compl. ¶¶ 18-37.)  On June 14, 2023, this Court granted the City of Battle Creek's motion to dismiss, dismissing all claims against it.  The Officers have filed a Motion for Summary Judgment on Young's remaining claims, asserting qualified immunity.

## II. LEGAL FRAMEWORK

### A. Summary Judgment

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law."  *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (internal marks and citation omitted).  This language compels summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986).  On a motion for summary judgment, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted). Even when the parties' versions of events differ, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion.  In qualified immunity cases, this usually means adopting the plaintiff's version of the facts."  *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007) (holding, however, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Once the moving party has carried its burden, the non-moving party must set forth specific facts, supported by evidence in the record, showing a genuine issue for trial exists. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The function of the district court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Resol. Tr. Corp. v. Myers*, 9 F.3d 1548 (6th Cir. 1993) (citing *Anderson*, 477 U.S. at 249).

## B. Qualified Immunity

"Qualified immunity spares officers from 'the time, expense and risk of money-damages actions' unless they violate clearly established constitutional rights." *Moore v. Oakland Cnty., Mich.*, 26 F.4th 1163, 1167 (6th Cir. 2025) (quoting *Hogans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508 (6th Cir. 2012)). To overcome the defense, the claimant must show that "(1) the officers violated a 'constitutional right' and (2) the right was 'clearly established.'" *Moore*, 126 F.4th at 1167 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court may address the prongs in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). When multiple officers are involved, the Court must assess each officer's entitlement to qualified immunity separately. *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam). And when the claimant asserts distinct claims that occurred as a result of one transaction, "the appropriate method of analysis is to 'carve up the incident into segments and judge each on its own terms. . . .'" *Dickerson v. McCllellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994)).

So, Young bears the burden of demonstrating both that Officer Day and Henley's conduct violated one of his constitutional rights, and that the right was so clearly established at the time that

"every reasonable official would have understood that what he [was] doing violate[d] that right." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011).

This Court looks to the decisions of the United States Supreme Court and the Sixth Circuit, in determining whether a right is clearly established. *Carver v. City Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *see Andrews v. Hickman Cnty., Tenn.*, 700 F.3d 845, 853 (6th Cir. 2012) ("When determining whether a constitutional right is clearly established, we look first to the decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeals."). "In identifying clearly established rights, the Supreme Court [cautions] lower courts against defining them 'at a high level of generality.'" *Moore*, 126 F.4th at 1167-68 (quoting *Ashcroft*, 563 U.S. at 742) (explaining why some Fourth Amendment principles offer little guidance in qualified-immunity cases). But that does not mean that the claimant must provide "a case directly on point. . . ." *Baynes v. Cleland*, 799 F.3d 600, 612-13 (6th Cir. 2015) (internal marks and citation omitted). Typically, the claimant must "identify a case with facts 'similar enough that' it 'squarely governs this one,' *Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022) (quotation omitted), what amounts to 'on-point caselaw that would bind a panel of this court,' *Bell v. City of Southfield*, 37 F. 4th 362, 368 (6th Cir. 2022)." *Moore*, 126 F.4th at 1167-68.

## III. ANALYSIS

Young alleges that the Officers violated his Fourth Amendment rights. Specifically, he claims that his Fourth Amendment rights were implicated and violated at three points: (i) when the Officers stopped him to conduct a pat-down search; (ii) when the Officers used a takedown maneuver to handcuff him; and (iii) when the Officers arrested him for resisting arrest and obstruction of justice. (*See* Compl. ¶¶ 18-37.) But because Young brings this suit against two officers, Officers Day and Henley, the Sixth Circuit instructs this Court to "consider each officer's entitlement to qualified immunity." *Smith*, 874 F.3d at 944 (citation omitted); *Taylor v. Davidson Cnty. Sheriff's Dep't*, 832

F. App'x 956, 960 (6th Cir. 2020). "[And] the Court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way." *Smith*, 874 F.3d at 944 (citing *Morrison v. Bd. of Trs. Of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009)); *Dickerson*, 101 F.3d at 1161.

### A. Count II (Fourth Amendment: Unreasonable Stop and Frisk) (Officer Day)

Viewing the facts in the light most favorable to Young, Officer Day violated Young's Fourth Amendment rights by stopping and frisking him without reasonable suspicion.

#### 1. Officer Day violated Young's Fourth Amendment rights when he grabbed Young to effectuate a pat-down search.

"A seizure occurs where, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). An officer may commit a seizure by "a laying on of hands or application of physical force to restrain movement, even when . . . ultimately unsuccessful." *California v. Hodari D.*, 499 U.S. 621, 626 (1991). Courts recognize three categories of seizure that have different levels of scrutiny. *Smoak*, 460 F.3d at 779-81; *see Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009). An investigatory *Terry* stop, requires reasonable suspicion that criminal activity is afoot; a *Terry* frisk, requires reasonable suspicion that the suspect stopped is armed and dangerous; and an arrest, requires probable cause that a crime has occurred. *See Johnson*, 555 U.S. at 326-27.

Starting with the *Terry* stop. There is no question that Officer Day seized Young. *See United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quoting *Mendenhall*, 446 U.S at 554); *cf. United States v. Holmes*, No. CR 23-20075, 2023 WL 3886047, at *3 (E.D. Mich. June 8, 2023) (finding no seizure where the officers did not display weapons, physically touch the defendant, or use language or a tone of voice compelling compliance). Moreover, both parties agree that when

Officer Day initially grabbed Young, he effectuated a *Terry* stop.  (Br. in Supp. of Mot. for Summ. J., ECF No. 45, PageID.300.)

So, the question becomes, did Officer Day have a proper basis for the stop?  An officer may conduct an investigatory stop if the officer has "reasonable suspicion" that criminal activity is afoot. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  Reasonable suspicion "requires more than just a 'mere hunch,' but is satisfied by a likelihood of criminal activity less than probable cause. . . ." *Smoak*, 460 F.3d at 778 (quoting *Arvizu*, 534 U.S. at 274).  The officer must possess "a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts." *Smoak*, 460 F.3d at 778 (quotations omitted).  Put differently, a *Terry* stop "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981).  Notably, "[t]here is no reasonable suspicion merely by association." *United States v. Black*, 707 F.3d 531, 539-40 (4th Cir. 2013); *United States v. Noble*, 762 F.3d 509, 523-25 (6th Cir. 2014); *see Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.") (citing *Sibron v. New York*, 392 U.S. 40, 62-63 (1968)).  And "[a]n individual's presence in an area of expected criminal activity, *standing alone*, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 214 (2000) (emphasis added).

Before Officer Day stopped Young, he knew four things.  First, Howland Street is located in Washington Heights, a high-crime area.  (Day Dep. 21.)  Second, Robinson was a convicted felon. (*Id.* at 24.)  Third, Robinson brandished a pistol on his Snapchat story twenty-five minutes beforehand.  (Police Report, PageID.316.)  Fourth, in his experience, felons who possess a firearm may pass it to a non-felon to avoid an unlawful possession charge.  (Day Dep. 96.)

Before Officer Day stopped Young he did not know or have any particularized or objective reason to believe these seven things.  One, who Young was.  (*Id.* at 22.)  Two, why Young was there.  (*See id.* 23-26.)  Three, whether Robinson made any movement toward Young.  (*See* Day Body Worn Camera, 00:40-00:52.)  Four, whether Robinson passed a firearm to Young.  (*See* Day Dep. 91, 98.)  Five, whether Young was armed.  (*See id.*)  Six, whether Young had anything in his hands.  (*Id.* at 97.)  Seven, whether Young had a bulge near his hip area.  (*Id.* at 63.)

Here, the totality of the factors outlined by Officer Day fails to support the conclusion that he had reasonable suspicion to stop Young.  Officer Day had nothing more than a hunch.  (*See id.* at 65.)  He even admits as much:

> Q: [Y]ou didn't have any information that [Young] had any firearms or weapons on his person; right?
> A: Correct.  That's why I was trying to figure out and make sure he didn't have any firearms, so I could go deal with [Robinson].

(*See id.*)  Officer Day has not produced one "particularized and objective fact" for suspecting Young of criminal activity.  *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016).  Indeed, Young was in a high-crime area and Young stood in proximity to a person suspected of criminal activity.  But standing in a high-crime area is not illegal.  Neither is standing next to a person suspected of criminal activity.  These facts, even when coupled with Officer Day's unsubstantiated assumptions, fail to support the conclusion that he had reasonable suspicion to stop Young.  *See e.g.*, *Ybarra*, 444 U.S. at 91 (holding that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.");  *Wardlow*, 528 U.S. at 214 (holding that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.");  *United States v. See*, 574 F.3d 309, 314-15 (6th Cir. 2009) (suppressing evidence where a group of men were parked in a car in a dimly lit, high crime area at 4:30 a.m., the car did not have

a front license plate, the officer did not witness any criminal activity, and suspects did not "do anything suspicious" or try to flee the scene upon seeing the officer). Thus, Officer Day violated Young's Fourth Amendment rights when he stopped him without reasonable suspicion.

### 2. Officer Day had a fair warning that he did not possess reasonable suspicion to stop Young.

The next question is whether the right was "clearly established." *See Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008). In identifying clearly established rights, this Court must not define them "at a high level of generality." *Ashcroft*, 563 U.S. at 742. Young must show that the right's contours were "sufficiently clear" such that "every reasonable official would have understood" that the officer's actions violated it. *Moore*, 126 F.4th at 1167 (quoting *Ashcroft*, 563 U.S. at 741).

The following Fourth Amendment tenets are helpful with the imperative of defining a right with the requisite specificity. *See Moore*, 126 F.4th at 1167-68 (explaining that some Fourth Amendment tenets are more helpful than others when defining a right with specificity).

First, reasonable suspicion demands "*a particularized and objective basis* for suspecting [that] *the particular person*" is committing a crime, or has, or is about to commit a crime. *Cortez*, 449 U.S. at 417 (emphases added). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

Second, the Supreme Court of the United States and Sixth Circuit have held that a person's mere presence to others independently suspected of criminal activity does not, without more, give rise to reasonable suspicion. *See Ybarra*, 444 U.S. at 91; *Sibron*, 392 U.S. at 62-63; *United States v. Bell*, 762 F.2d 495, 499 (6th Cir. 1985); *Noble*, 762 F.3d at 523.

Third, being in a high-crime area alone is not enough to create reasonable suspicion. *Wardlow*, 528 U.S. at 124; *see, e.g.*, *Wilkerson v. City of Akron*, 906 F.3d 477, 481 (6th Cir. 2018) (holding that one's presence in a public place at night in a high-crime area and appearing nervous did not establish reasonable suspicion).

14

Fourth, a police officer's experience is but one factor in the totality analysis, "and is not determinative of reasonable suspicion to justify an investigatory stop." *United States v. McAllister*, 31 F. App'x 859, 865 n.3 (6th Cir. 2002) (citing *Arvizu*, 534 U.S. at 273-74); *Bey v. Falk*, 946 F.3d 304, 313 (6th Cir. 2019) (quoting *Cortez*, 449 U.S. at 417) ("The deference we owe to police officers on the ground can only stretch so far, and here [the officer] had seen nothing constituting an 'objective manifestation' that [plaintiff] 'was, or was about to be, engaged in criminal activity.'").

As this collection of rights is clearly established, Officer Day is not entitled to qualified immunity for unlawfully stopping Young.

### 3. Officer Day violated Young's clearly established rights when he frisked Young without reasonable suspicion.

Only "[w]hen an individual is subject to a lawful investigative detention, an officer may conduct a limited frisk or pat-down of that person for weapons if the officer has a reasonable suspicion of criminal activity and a reasonable belief that the suspect is armed and dangerous." *United States v. Brown*, 20 F. App'x 387, 388 (6th Cir. 2001) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). As just established, Officer Day did not have reasonable suspicion to believe Young had, was, or was about to commit a crime. Thus, he had no reasonable basis for believing Young was armed and dangerous.

The Court finds that Officer Day is not entitled to qualified immunity concerning Young's claim that Officer Day violated his Fourth Amendment rights to be free from unreasonable searches and seizures.

### B. Count II (Fourth Amendment: Unreasonable Stop and Frisk) (Officer Henley)

A jury could find that Officer Henley violated Young's Fourth Amendment rights when he assisted Officer Day in stopping and frisking Young.

Qualified immunity analysis requires the Court to address defendants separately when multiple individuals are involved in an incident. *Jones v. City of Elyria*, 947 F.3d 905, 910, 913 (6th Cir. 2020). In other words, this Court "must consider each official on her own terms, examining the relevant events from her perspective in evaluating her entitlement to qualified immunity." *Id.* at 915 (citing *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)).

For instance, in *Jones*, the plaintiff sued two officers alleging that the officers falsely arrested him and used excessive force. *Id.* at 911-12. The plaintiff also tried to lump in a third officer, officer Mitchell, who reached the scene "well after" the initial responding officers, because she helped those officers subdue the plaintiff. *Id.* at 916. The court found that the two officers who made initial contact with the plaintiff were not entitled to qualified immunity because they arrested the plaintiff for resisting an unlawful search and seizure under *Terry*. *Id.* at 913-15. But officer Mitchell was entitled to immunity. *Id.* Because she "was not there when her fellow officers made initial contact with [the plaintiff], nor did she witness the events leading up to the pat-down of the plaintiff. And soon thereafter, she saw her [fellow officers] take [the plaintiff] to the ground." *Id.* Given these facts, the court found that a reasonable officer in her shoes would have believed that subduing and effectuating the plaintiff's arrest was the surest way to secure the scene. *Id.* Thus, the actions of the first two officers, "taken with a more fulsome appreciation of the facts on the ground, [were] enough to deny them qualified immunity," those actions, however, were not imputed to officer Mitchell. *Id.*

Unlike officer Mitchell, Officer Henley had a fulsome appreciation of the facts on the ground. On July 24, 2021, shortly after Officer Day viewed Robinson's Snapchat video, Officer Day gave Officer Henley "a brief overview of [what] he was going to do. Showed [him] the Snapchat video of Robinson holding a gun. And said that [Robinson]'s up here at . . . 216 Howland Street." (Henley Dep. 33-34.) They agreed to engage Robinson at his apartment complex. (*Id.* at 37-38.) Officer Henley followed Officer Day to 216 Howland Street. (*Id.*) He testified that he was "10

16

seconds or something like that behind" Officer Day.  (*Id.*)  Officer Day exited his cruiser first and started approaching the porch, shining his flashlight on Robinson, Young, and Stein.  (Day Body Worn Camera 00:35-1:00; Henley Body Worn Camera 00:28-00:30.)    Officer Henley simultaneously got out of his police cruiser and saw Day approaching and shining his flashlight on them.  (Henley Body Worn Camera 00:28-00:30.)  Officer Henley then ran towards the porch and called for backup.  (*Id.* at 00:28-00:41.)  Officer Henley then shined his flashlight on Officer Day when Day put Young's hands behind his back.  (*Id.* at 00:35-00:53.)  Noticing that Officer Day was struggling, Officer Henley told Young to "stop," put a handcuff on Young's left wrist, and tried to get Young's hands behind his back.  (*Id.*)   And like Officer Day, Officer Henley had no particularized or objective facts to reasonably believe that Young was armed and dangerous:

> Q: What evidence do you have that it was [Young] who could have had Robinson's gun versus [Stein] since they're both . . . within arm's reach of each other?
> A: I guess as far as, like, evidence goes, I don't have . . . if one or the other could have had it.
> . . .
> Q: Did you ever see [Young's] hand go in his pockets?
> A: I didn't see him really grab for anything.
> Q: Did you ever see him put his hands in his pocket?
> A: I did not see that.
> . . .
> Q: What evidence do you have that [Robinson may have passed the firearm prior to fleeing]?
> A: The firearm could have been anywhere, I guess. . . . He could have taken it inside. Really didn't know where it was at the time.

(Henley Dep. 52-54, 90.)

A reasonable officer in Officer Henley's position would have reason to suspect that his decision to assist Officer Day was unlawful.  Because from Henley's perspective, he could not reasonably conclude that Young was resisting a *lawful* stop or arrest.  *Cf. Greene v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002).  Unlike officer Mitchell, who had no knowledge of the lead-up, Officer Henley was less than thirty seconds behind Officer Day; he had the same fulsome appreciation of

the facts as Officer Day.  Therefore, from what he knew then, he is not entitled to qualified immunity on the unreasonable search and seizure claim.

### C. Count III (Fourth Amendment: Unlawful Arrest) (Officers Day and Henley)

Because Officer Day and Officer Henley played similar roles in the arrest of Young, the Court lumps them together.  *See, e.g., Jones*, 947 F.3d at 913-15 (conducting the same qualified immunity analysis for the responding officers).  A jury could find that the Officers violated Young's Fourth Amendment right to be free from unlawful arrests when they arrested him for resisting arrest and obstructing justice without probable cause.

An officer must have probable cause before arresting a suspect.  *Malley v. Briggs*, 475 U.S. 335, 340-41 (1986).  "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed."  *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2002) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)).  "Because probable cause is an objective standard, there must be 'concrete' and 'articulable facts' from which an officer can reasonably infer criminal conduct."  *Jones v. Naert*, 121 F.4th 558, 565 (6th Cir. 2024) (quoting *McCurdy v. Montgomery Cnty.*, 240 F.3d 512, 517, 519 (6th Cir. 2001), *abrogated on other grounds by Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006)).  The Court does not consider the officer's subjective intent.  *Jones*, 121 F.4th at 565.  A person who has been the victim of an arrest without probable cause has a claim based on the Fourth Amendment guarantee that government officials may not subject citizens to searches or seizures without proper authorization.  U.S. Const. amend. IV; *Gardenhire v. Schubert*, 205 F.3d 303, 312-13 (6th Cir. 2000).

The Officers arrested Young for resisting arrest and obstructing justice under Mich. Comp. Laws § 750.81d(1):

> [A]n individual who assaults, batters, wounds, resists, **obstructs**, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $ 2,000.00, or both.

(emphasis added).  The statute defines "obstruct" as the "use of physical interference or force or a knowing failure to comply with a *lawful* command." Mich. Comp. Laws § 750.81d(7)(a) (emphasis added).  The Michigan Supreme Court has interpreted this statute to incorporate the common law principle that "one may use such reasonable force as is necessary to . . . resist an illegal arrest." *People v. Moreno*, 814 N.W.2d 624, 628 (Mich. 2012) (quoting *People v. Krum*, 132 N.W.2d 69, 72 (Mich. 1965)).  Consequently, an individual does not violate § 750.81d(1) when he resists or opposes *unlawful* police conduct.  *See e.g.*, *United States v. Fuller*, 120 F. Supp. 3d 669, 686-87 (E.D. Mich. 2015).

Here, the Officers violated Young's constitutional right to be free from unlawful arrests.  The Officers had no reasonable suspicion to stop-and-frisk Young.  The lack of reasonable suspicion made the stop-and-frisk unlawful.  And because Young had a right to use reasonable force in resisting the unlawful stop-and-frisk, he did not violate § 750.81d(1) when he passively resisted.  The Officers, therefore, violated Young's constitutional rights when they arrested him without probable cause.

Not only are the rights identified above protected by the Constitution, but they are also quintessential examples of "clearly established" rights.  For over fifty years, the Supreme Court has established that officers may not conduct a non-consensual frisk and pat-down search without reasonable suspicion of criminal activity.  *See Terry*, 392 U.S. at 27.  "Equally well settled is one's right to freedom from arrest without probable cause." *Jones*, 947 F.3d at 915 (citing *Malley*, 475

U.S. at 340-41).  So, too, is the fact that "one may use . . . reasonable force as is necessary . . . to resist an illegal arrest."  *Moreno*, 814 N.W.2d at 628.

Accordingly, the Officers are not entitled to qualified immunity to the wrongful arrest claim.

### D. Count I (Fourth Amendment: Excessive Force) (Officers Day and Henley)

Importantly, at the summary judgment stage, the Court need not conclusively decide whether Young's Fourth Amendment rights were violated by the Officers' use of force, or whether such violation was clearly established.  *Osborn v. City of Columbus*, No. 22-3570, 2023 WL 2523307 (6th Cir. Mar. 15, 2023).  The Court asks whether Young has presented sufficient evidence "to create a genuine dispute of material fact as to both of these questions in response to the Officers' assertion that there is none."  *Id.* (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015)).  If so, qualified immunity must be denied.  *Id.* (citing *Hernandez v. Boles*, 949 F.3d 251, 258-59 (6th Cir. 2020)).  The Court finds that he has.

### 1. The Officers violated Young's Fourth Amendment rights by performing the takedown maneuver.

The Fourth Amendment protects individuals from excessive force by law enforcement officers.  *Graham v. Connor*, 490 U.S. 386, 394-95 (1989).  Under *Graham*, all claims of excessive force by officers, whether in the case of "an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Id.* The inquiry is objective and considers "whether officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.  Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396.  These factors are assessed

"from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citing *Graham*, 490 U.S. at 395-96).

### a.  Severity of Crime

The first *Graham* factor weighs against the reasonableness of the takedown maneuver.

When analyzing this factor, the Court looks at the nature of the alleged crime.  *Graham*, 490 U.S. at 396; *Roell v. Hamilton Cnty., Ohio/Hamilton Cnty. Bd. of Cnty. Comm'rs*, 870 F.3d 471, 481 (6th Cir. 2017).  Additionally, whether the officers had probable cause to arrest the plaintiff for the alleged crime.  *See, e.g.*, *Wright v. City of Euclid*, 962 F.3d 852, 866-67 (6th Cir. 2020) ("The first *Graham* factor, relating to the severity of the suspected crime, thus cuts against a finding of justified force because there was no probable cause that [the plaintiff] had committed any crime. . . ."); *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (noting that "the fact that a plaintiff in a § 1983 suit had committed no crime clearly weighed against a finding of reasonableness").  The Officers attempt to shift the analysis to the crime they were investigating.  But doing so would cause too much overlap with the remaining factors: "Of course, the use of force can be reasonable, even when the crime at issue is innocuous.  To determine whether this is so, we turn to the [second and third] Graham factors."  *Wright*, 962 F.3d at 867 (quoting *Thomas v. Plummer*, 489 F. App'x 116, 126 (6th Cir. 2012)).  The Court, therefore, focuses on the nature of the crime Young allegedly committed and whether the Officers had probable cause to arrest him for that crime.

It is undisputed that the Officers did not suspect Young of committing a crime when they arrived at Robinson's apartment complex.  (Day Dep. 28; Henley Dep. 32.)  Furthermore, at no point *before* Officer Day seized Young did he have reasonable suspicion, let alone probable cause to stop or arrest him.  (Day Dep. 65; Henley Dep. 52-54, 90.)  The Officers, moreover, cannot rely on the fact that Young passively resisted the stop and frisk to justify the takedown maneuver—"[t]he crime of disorderly conduct is not a violent or serious crime, and this fact weighs in favor using less

force in arresting [the plaintiff]." *Thacker v. Lawrence Cnty.*, 182 F. App'x 464, 472 (6th Cir. 2006). Thus, the first *Graham* factor, relating to the severity of the suspected crime, cuts against finding justified force. *See, e.g.*, *Wright*, 962 F.3d at 867 (finding that the first factor cuts against finding justified force because the officer did not have probable cause to arrest him).

### b. *Threat of Safety to Officers or Others*

Construing the record in the light most favorable to Young, the second *Graham* factor—the immediate safety threat posed by the suspect to police and others—weighs in his favor, too. Young posed no threat to anyone. He was standing and talking to his brother while listening to music. (Young Dep. 41, 44.) He never moved towards or away from Officer Day as he approached. (*See* Day Body Worn Camera 00:47-01:00.) He made no threats or threatening gestures towards either officer. (*See id*; Henley Body Worn Camera 00:25-01:35.) He did not brandish any weapons or change his posture to indicate he would fight or flee. (*See id.*) He just stood there. (*See id.*)

The Court acknowledges the Officers' point about unknown threats. They argue that Young posed a threat because they "had no way of knowing what . . . weapons may be present that could be used against them." (Br. in Supp. of Mot. for Summ. J., PageID.310.) True, in general, officers do not know whether a suspect or bystander has a weapon, aims to do them or others harm, or intends to flee. The Court, however, is tasked with judging the Officers' reactions given the information they had available to them at the time and whether a reasonable officer would have done what they did. In this situation, a reasonable officer would have seen or should have seen that Young did not have a firearm in his hands and no bulge protruded from his body. Plus, Young made no movement towards them, made no threats, made no attempt to flee, or grab anything, and made no attempt to assume an aggressive or flight-ready posture. Accordingly, the second factor also cuts against finding justified force.

### c. *Active Resistance*

The final factor also lessens the finding of justified force.  The Sixth Circuit holds that "active resistance to an officer's command can justify use of [force]" but "passive resistance—or no resistance at all—does not justify such use of force."  *Wright*, 962 F.3d at 867 (citing *Goodwin*, 781 F.3d at 323).  It was well-established at the time of the incident "that a non-violent, non-resisting, or only passively resisting suspect who is not under arrest has a right to be free from an officer's use of force." *Smith*, 874 F.3d at 945 (citing *Kent v. Oakland Cnty.*, 810 F.3d 384, 396 (6th Cir. 2016)).

In *Smith*, the police officers tased a plaintiff who was having an epileptic seizure.  874 F.3d at 942.  When the officers arrived, the plaintiff was standing outside his car, holding onto a fence, which led them to mistakenly assume he was driving under the influence.  *Id.*  One officer attempted to pry the plaintiff's fingers off the fence in order to return him to his car.  *Id.*  The plaintiff then pulled his arm away from the officer, prompting the officer to force him to the ground and struggle with him until a second officer arrived and deployed a taser.  *Id.*  The Sixth Circuit ruled that the officers were not entitled to qualified immunity on the plaintiff's excessive force claim because "[a] reasonable juror could conclude that, in pulling his arm away, [the plaintiff's] resistance was minimal and that [the force used] was excessive."  *Id.* at 945.

Similarly, in *McCaig v. Raber*, the court ruled that a takedown maneuver constituted excessive force where the officers restrained the suspect by both arms and the suspect could not, or refused to, put one arm behind his back, and "jerked away" after the arresting officer shouted in his ear. 515 F. App'x 551, 553-55 (6th Cir. 2013).

Here, there is no dispute that Young at least passively resisted.  However, a genuine dispute of material fact exists as to whether Young actively resisted the Officers' force.  The Officers argue that Young actively resisted the stop and frisk when he tensed his arms and twisted his body.  But Young testified that he never "jerked away from them," or that he was deliberately "tense" at most, he "kind of jumped."  (*See* Young Dep. 117.)  When Officer Day grabbed him, it startled him.  (*Id.*)

23

The video does not contradict Young's account—the video shows that the only movements Young made were those that a reasonable jury could believe were caused by the Officers' application of force.  Maybe the Officers did feel Young unnecessarily tensed his arms and body in a way that indicated he was actively resisting arrest, but that is not apparent from the video.  In addition, the Officers never told Young he was under arrest.  (Day Dep. 51; Henley Dep. 44); *see Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009); *Shumate v. City of Adrian*, 44 F.4th 427, 447 (6th Cir. 2022) ("[Plaintiff] had not been told he was under arrest prior to being tased, so his resistance, if it was resistance at all, was merely passive, rendering unreasonable the first use of the Taser less than a minute after his arrival on the scene."); *Wright*, 962 F.3d at 868-69.

The Officers also argue that Young was verbally belligerent when the Officers attempted to put his hands behind his back by saying, "what is you doing," "you can't do that," and "I know my rights."  (Day Body Worn Camera 00:47-01:20.)  In construing the facts most favorably to Young, the Court does not construe his comments as verbal hostility; he was questioning their commands and that refusal, by an unthreatening suspect, does not warrant the use of significant force.  *See, e.g., Lustig, v. Mondeau*, 211 F. App'x 364, 370 (6th Cir. 2006) (finding that passive resistance and yelling while detained did not justify arm twisting and jerking that caused injury).  The peak of Young's resistance was him telling the Officers they were violating his rights and the Officers' testimony accusing Young of tensing up.  These facts are not enough to entitle the Officers to qualified immunity.

## 2. Young's constitutional right to be free from excessive force was clearly established at the time of the incident.

For a constitutional right to be clearly established, the plaintiff doesn't need to cite a case with identical facts.  *See Moore*, 126 F.4th at 1167.  The key question is whether the defendants had a fair warning that their conduct was unconstitutional.  *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The Officers had a fair warning that a takedown maneuver, in this instance, was unjustified. The use of a takedown on an unrestrained, non-fleeing, non-violent suspect has been held, in similar circumstances, to be objectively unreasonable. *See e.g.*, *Wright*, 962 F.3d at 861, 867; *Smith*, 874 F.3d at 945; *McCaig*, 515 F. App'x at 553-55; *Lustig* 211 F. App'x at 370.

For instance, in *McCaig*, the officer bear hugged the plaintiff and "while lifting him up and executing a leg sweep, 'slamm[ed]' [the plaintiff] to the ground back-first." 515 F. App'x at 553. He was slammed with such force that he broke his wrist. *Id.* Admittedly, the force in *McCaig* was more force than in this case. But here, the takedown maneuver led to the plaintiff going face and chest first into the ground rather than back-first. (*See* Stein Cell Phone Video 00:00-00:05.) Another distinction is that the plaintiff in *McCaig* said he would "go easily." 515 F. App'x at 553. Young never offered compliance; he consistently asked them, "what is y'all you doing?" and told them they can't put him in cuffs. (*See* Day Body Worn Camera 00:57-01:35.) These differences, however, do not change the fact that the trigger that caused the defendants to escalate their use of force was a tensing up or jerking away that was at least arguably caused by themselves and could easily be construed as a natural, involuntary reaction and not an attempt to flee or hide contraband. *McCaig*, 515 F. App'x at 553; (*See* Day Dep. 50-51, 62; Henley Dep. 62.) In short, *McCaig* is a materially similar case that gave the Officers fair warning.

### E. The Officers' Arguments to the Contrary are Unavailing.

### 1. Young being near Robinson did not give the Officers an "automatic green light" to stop and frisk him.

The Officers mistakenly rely on *United States v. Bell*, 762 F.2d 495 (6th Cir. 1985), arguing that Young's proximity to Robinson gave them reasonable suspicion to stop and frisk Young. (Br. in Supp. of Mot. for Summ. J., PageID.303-04.)

The Court acknowledges that officers are "not obliged to ignore the fact" that a bystander near a person known to be potentially armed and dangerous may be dangerous themselves. *Bell*, 762 F.2d at 501. Yet that fact alone does not give officers an "automatic green light" to stop and frisk anyone near a person known to be armed and dangerous. *See Noble*, 762 F.3d at 524. *Bell* certainly doesn't: "As to the propriety of the 'automatic companion' rule, we do not believe that the *Terry* requirement of reasonable suspicion under the circumstances . . . has been eroded to the point that an individual may be frisked based upon nothing more than an unfortunate choice of associates." 762 F.2d at 499. Rather, fact of companionship should be considered in the mix of other facts and circumstances. *See id.* at 499 n. 4. As this Court discussed, the totality of circumstances on July 24, 2021, did not give the Officers reasonable suspicion to stop and frisk Young.

### 2. No exigent circumstances existed to justify the stop and frisk.

They also argue that even if the stop and frisk was not lawful under *Terry*, exigent circumstances justified the stop and frisk. (Br. in Supp. of Mot. for Summ. J., PageID.305-06.) They rely on the hot pursuit doctrine, the risk of danger to the police and others doctrine, and the imminent destruction of evidence exception. (*Id.*, PageID.305-08.)

***Hot Pursuit.*** The hot pursuit doctrine did not give the Officers authority to stop and search Young. This exception to the warrant requirement typically involves "a situation where a suspect commits a crime, flees and thereby exposes himself to the public . . . and the emergency nature of the situation necessitates immediate police action to apprehend the suspect." *Cummings v. City of Akron*, 418 F.3d 676, 686 (6th Cir. 2005). The Officers argue that this doctrine should be expanded to allow officers to stop and search any bystander in the path of the fleeing felon. Notably, they cite no precedent that suggests such an expansive rule. The hot pursuit exception is narrow; it gave the Officers authority to search only Robinson—not Young—without a warrant. *See United States v.*

26

*Santana*, 427 U.S. 38, 43, (1976) (explaining that the purpose of the doctrine is to ensure that a suspect cannot "defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place").  Thus, the hot pursuit exception did not give the Officers authority to stop and search Young.

**Risk of Danger to the Police.**  The Officers also contend that "[d]elaying the pat down of Plaintiff would have increased the risk to the officers' safety."  (Br. in Supp. of Mot. for Summ. J., PageID.306.)  Therefore, they did not need reasonable suspicion to stop and search Young.  (*Id.*) The "qualification for this exception is not easy" *United States v. Purcell*, 526 F.3d 953, 960 (6th Cir. 2008) and "requires a particularized showing of a risk of immediate harm."  *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 562 (6th Cir. 2018).  The Court has firmly established that "an arresting officer's state of mind (except for the facts that he knows) is irrelevant" to the inquiry.  *Devenpeck*, 543 U.S. at 153.

Here, the Officers rely mainly on their subjective beliefs.  Rather than pointing to particularized facts, they argue that felons who unlawfully possess a firearm will pass the firearm to a non-felon to avoid criminal liability.  Maybe.  But that is no more than a generic possibility; "generic possibilities of danger cannot overcome the required particularized showing of a risk of immediate harm."  *Morgan*, 903 F.3d at 562.  And even if the Officers knew that Young had a weapon, "[t]he mere presence of firearms does not create exigent circumstances."  *Id.* (quoting *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994)).

*Michigan v. Summers*, 452 U.S. 692 (1981) does not change the analysis either.  The *Summers* Court held that the police may temporarily seize occupants of a house during the execution of a search warrant for the premises: "Of prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband."  *Id.* at 701.  Here,

however, the Officers did not obtain a search warrant for Robinson's residence.  Thus, the *Summers* exception does not apply.

       *Imminent Destruction of Evidence.*  This exception also requires the Officers to show "an objectively reasonable basis for concluding that the loss or destruction of evidence is imminent." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1512 (6th Cir. 1988).  The Officers do not point to any reasonable basis for them to believe that Young was concealing the pistol Robinson brandished on his Snapchat story.

### 3. The Officers rely on cases that involve *lawful* arrests in arguing that they had probable cause to arrest Young for violating Section 750.81d.

       The Officers argue that they had probable cause to arrest Young for resisting arrest and obstructing justice under § 750.81d(1).  (Br. in Supp. of Mot. for Summ. J., PageID.316.)  Without question, officers have probable cause to arrest a suspect for resisting arrest if the suspect resists a *lawful* command.  *See Moreno*, 814 N.W.2d at 630.  The cases they cite certainly stand for that proposition.  But none of them involve an unlawful stop and frisk; moreover, they hinge on outdated precedent.  In 2012, the Michigan Supreme Court, in *Moreno*, held that Mich. Comp. Laws § 750.81d does not "abrogate the common-law right to resist an unlawful arrest."  814 N.W.2d at 631, 634; *see, e.g.*, *King v. City of Rockford*, 97 F.4th 379, 402 (6th Cir. 2024) (holding that because the officers "lacked probable cause both for the initial stop and for driving under the influence, a reasonable jury could find that King's resistance was triggered by [the officer]'s *unlawful* commands and was thus itself lawful.") (citations omitted).

       The stop and frisk here was unlawful.  Like the officers in *King*, the Officers lacked reasonable suspicion to stop and frisk Young.  As a result, Young was entitled to resist the unlawful stop and frisk, vitiating any violation of § 750.81d.

**4. The Officers erroneously view the facts and circumstances in a light most favorable to them in arguing that Young was actively resisting.**

"A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Morrison*, 583 F.3d at 400. At this stage, when the parties' accounts of events differ, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion. In qualified immunity cases, this usually means adopting the plaintiff's version of the facts." *Scott*, 550 U.S. at 378 (2007) (internal citations and quotation marks omitted). Unless the plaintiff's version is contradicted by unambiguous video evidence. *See id.* at 380-81.

The Officers, however, want this Court to view the facts in a light most favorable to them. They characterize Young as "physically" struggling with Officer Day, actively twisting his body, and being "verbally belligerent." (Br. in Supp. of Mot. for Summ. J., PageID.312.) The crux of their argument is that Young's verbal belligerence, in addition to his deliberate lack of physical cooperation, amounted to active resistance, which justified the takedown. (*Id.*)

Yet the Court is instructed to adopt Young's version and view the facts in a light most favorable to him unless plainly contradicted by the record. *See Scott*, 550 U.S. at 378, 380-81. Young's version of events is that he was standing on the concrete walkway minding his own business, talking to Stein and Robinson. (Young Dep. 47.) Once Officer Day showed up, Robinson got up from his seat on the porch and entered the apartment complex. (Day Body Worn Camera 00:45-00:52.) But Young, himself, made no sudden movements, kept his hands visible, and did not make any attempt to flee. (*Id.* at 00:50-00:59.) Officer Day approached him, grabbed his arm, and tried to pull it behind his back to finish the pat-down. (*Id.* at 00:50-01:10.) Once Officer Day grabbed

him, he kind of "jumped" because he was startled.  (Young Dep. 117-18.)  However, he did not jerk or move his body to escape.  (*Id*.; Day Body Worn Camera 00:50-01:35.)  Afterwards, Officer Henley approached and assisted Officer Day in getting Young's hands behind his back to handcuff him.  (Henley Body Worn Camera 00:33-01:10.)  After about thirty seconds of Young questioning their authority and the Officers being unable to handcuff him, they turn Young towards the street and take him to the ground.  (*Id*.)

The video does not plainly contradict this version of events.  It does not show Young (i) jerking away from the Officers; (ii) threatening the Officers; (iii) moving away from the Officers; (iv) attempting to flee from the Officers; (v) hitting the Officers; (vi) moving his arms or hands aggressively; or (vii) assuming a posture of aggression.  In sum, the video shows Young passively resisting.  Thus, taken in the light most favorable to Young, his passive noncompliance was not paired with any moments of active resistance or evasion that would justify a takedown maneuver.

It is natural for anyone to tense up when grabbed by an officer and quickly patted down.  Allowing an officer to use this as their basis for increased force would create a problem: if the Court adopts the Officers' position that a suspect's "tensing up" after being unexpectedly grabbed justifies a takedown maneuver, any officer could induce an involuntary reaction, thereby justifying the officer's use of increased force.  This cannot be.

### IV. CONCLUSION

For these reasons, the Court denies the Officers' Motion for Summary Judgment.


Dated: March 27, 2025                              /s/ Paul L. Maloney
                                                   PAUL L. MALONEY
                                                   UNITED STATES DISTRICT JUDGE